Kyle McLean (SBN 330580)
Lisa R. Considine (*pro hac vice forthcoming*)
Leslie L. Pescia (*pro hac vice forthcoming*)
**SIRI & GLIMSTAD**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: 212-532-1091
Facsimile: 646-417-5967
kmclean@sirillp.com
lconsidine@sirillp.com
lpescia@sirillp.com

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE GATES, PHLECIA MCCREA, and DEZARAE OROURKE individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FISHER-PRICE, INC. and MATTEL, INC.,<br><br>Defendants. | Case No.: 2:24-cv-9953<br><br>**CLASS ACTION COMPLAINT**<br> 1.  **VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND  DECEPTIVE TRADE PRACTICES ACT 815 ILCS §§ 505-1,** *et seq*.<br> 2.  **VIOLATIONS OF NEW YORK'S CONSUMER PROTECTION STATUTE N.Y. GEN. BUS. LAW §§ 349** *ET SEQ.*<br> 3.  **VIOLATION OF THE NEW YORK'S CONSUMER PROTECTION LAW ("NYGBL") §350,** *ET SEQ.*<br> 4.  **BREACH OF IMPLIED WARRANTIES**<br> 5.  **UNJUST ENRICHMENT**<br> 6.  **FRAUD**<br> 7.  **NEGLIGENT MISREPRESENTATION** |

**CLASS ACTION COMPLAINT**

- 1 -

**8. NEGLIGENCE – FAILURE TO WARN**

**JURY TRIAL DEMANDED**

Plaintiffs Valerie Gates, Phelcia McCrea and Dezarae O'Rourke ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Fisher-Price, Inc. ("Fisher-Price") and its parent company Mattel, Inc. ("Mattel") (collectively, "Defendants") and alleges the following based on personal knowledge as to themselves, and as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE ACTION

1.      Since 2010, Fisher-Price manufactured, marketed, and sold its signature line of "Snuga" swings ("Products"[1]), which are inclined infant swings that Defendants have marketed and sold throughout the United States (and beyond) as a safe and suitable environment for infant sleep.

2.      Fisher-Price has garnered the trust of parents and caregivers as one of the most well-known manufacturers of products for infants and children for decades. Accordingly, parents and caregivers trust Defendants to fairly and honestly market their products, especially those designed and marketed for infant sleep. However,

---

[1] The Products include, but are not limited to, all 21 substantially similar models of the Snuga Swing: My Little Snugakitty™ Cradle 'n Swing, My Little Snugabunny™ Swing, My Little Snugabear Cradle 'n Swing, My Little Snugabear Ballerina Cradle 'n Swing, Safari Dreams Cradle 'n Swing, Moonlight Meadow Swing, Sweet Snugapuppy™ Swing, Deluxe Swing- Surreal Serenity™, Sweet Snugamonkey Swing, Blooming Flowers Swing, Fawn Meadows Deluxe Swing, Peek-a-boo Fox Swing, Dots & Spots Puppy Swing, Snow Leopard Swing, Hearthstone Swing, Baby Raccoon Swing, My Little Snugabunny Cradle 'n Swing, My Little Sweetie™ Deluxe Cradle 'n Swing, My Little SnugaMonkey™ Cradle 'n Swing, My Little Snugapuppy™ Cradle 'n Swing, and My Little Snugabear Cradle 'n Swing.

**CLASS ACTION COMPLAINT**

- 2 -

Defendants' marketing was dangerously false and misleading, as the Products are not safe for infant sleep.

3.    Rather, inclined infant swings like Defendants' Products are dangerous and unsuitable for infant sleep. In fact, infant swings pose such a significant risk to infants that Defendants were forced to recall the Products on October 10, 2024.

4.    These infant swings are designed to simulate the soothing movement of being held by a caregiver. Because they are designed to do so, it is both well-known and expected by Defendants that infants will frequently be lulled to sleep during use. Defendants themselves have stated that the Products are "designed for soothing or for short naps."[2]

5.    Indeed, Defendants are well-aware that parents are universally seeking safe ways to help their babies fall asleep faster, which is why they have made safety representations and omissions that uniformly and intentionally represent to consumers that the Products are safe for infant sleep. These representations and omissions regarding the Products' safety can be found on Defendants' social media, websites, and the websites of Defendants authorized retailers.

6.    Defendants know that the safety of infants is paramount for parents, which is why Fisher-Price addresses explicitly its commitment to safety, claiming:

> **Our Commitment to Safety**
>
> Fisher-Price is committed to building relationships with children and earning the trust of their parents and caretakers. Since our founding, safety has been our highest priority. For more than ninety years, we have maintained an unrelenting focus on product safety, quality, and compliance. We are proud that families and children choose Fisher-Price again

---

[2] *Fisher-Price Cradle 'n Swing User Tips*, YouTube, (Nov. 6, 2015) https://youtu.be/WUecSoOOXnY?si=5V4W3QpU2EGEHfyM&t=62 (accessed November 13, 2024).

and again to make childhood more joyful and support parents through the early months and years of their babies' lives.[3]

7.    Defendant Mattel, Fisher-Price's parent company, likewise publicly expresses its commitment to safety on that same website and launched its own Medical and Scientific Safety Council, which "works closely with Mattel in providing professional opinions, advice and recommendations related to product safety, helping to inform our work and promote safe practices."[4]

8.    Despite Defendants' public commitment to the safety of consumers, the Products suffer from a defect wherein they fail to hold and maintain an appropriately level or flat sleeping surface that is safe and consistent with industry standards and guidance regarding infant sleep ("Defect"). The Defect renders the Products unsafe for infant sleep, which is inconsistent with reasonable consumer expectations, contrary to Defendants' pervasive representations and omissions regarding the safety of the product, and takes advantage of the trust Defendants have built with their consumers over the past several decades.

9.    The Defect exists at the point of purchase and is known to Defendants and unknown to consumers, including Plaintiffs, at the time of purchase.

10.    As a result of the Defect, the Products are unable to conform to the promises and representations made by Defendants, and the Products are inherently unsafe as an infant swing suitable for infant sleep, and are thus, unfit for their intended use.

11.    Defendants failed to adequately warn Plaintiff and Class Members that the Product contains the Defect, is not safe or suitable for infant sleep, and could cause and has caused infants to be at risk.

---

[3] *Safe Start*, Mattel.com, https://shop.mattel.com/pages/safe-start (accessed November 13, 2024).
[4] *Id.*

**CLASS ACTION COMPLAINT**

12.     Defendants' misrepresentations and omissions regarding safety have convinced reasonable consumers that the Products can provide a *safe* sleep environment, but this is not the case. The Defect positions the infant at a head-to-toe incline and significantly increases the risk that the infant's head will slip into a dangerous position, tilt to constrict the windpipe, and/or cause the infant's face to become pressed against the padded fabric in the sleeper and block airflow, all of which the infant may be unable to correct. This increases the risk of death by asphyxiation and makes it impossible to ensure safe sleep conditions for infants.

13.     The design of the Products can also lull infants into a deeper sleep than normal, making it more difficult for them to wake up if their airflow becomes obstructed.

14.     Defendants were keenly aware of these risks for as long as they sold the Products. Even before the product was introduced to the market in 2010, the American Academy of Pediatrics ("AAP") and major consumer groups repeatedly issued warnings about the serious dangers of inclined products marketed and sold for infant sleep, like the Products at issue.

15.     Further, since 2012, at least five deaths involving infants 1 to 3 months of age who used the Products for sleep have been reported.[5]

16.     Despite this, Defendants ignored these documented safety concerns and intentionally and knowingly marketed and sold the Products to consumers nationwide as a swing suitable for infant sleep.

17.     Finally, on October 10, 2024, after repeated warnings from experts and the death of five infants, Defendants were forced to recall approximately 2.1 million

---

[5] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, CPSC.gov, https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported (accessed November 13, 2024).

individual Products in the United States, Australia, Canada, and Mexico and cease

selling the product ("Recall").[6]

18.    The Recall notice ("Recall Notice") confirms the existence of the

dangerous Defect (emphasis added):

> **Hazard:** The swing should **never be used for sleep** … If the product is used for sleep … the headrest and body support insert on the seat pad can **increase the risk of suffocation.[7]**

19.    The Recall Notice further confirms the fact that the Products are

completely unsafe for infant sleep (emphasis added):

> **…never use these products for sleep…even after the headrest and the body support insert have been removed**. Parents and caregivers should never use any inclined seated products, such as swings, gliders, soothers, and rockers, for infant sleep and should not leave infants in these products unsupervised, unrestrained, or with bedding material due to the risk of suffocation.[8]

20.    The Recall Notice advises consumers to "immediately remove both the

headrest (by cutting the tether) and the body support insert from the seat pad before

continuing to use the swing for awake-time activities."[9] Thus, Defendants place the

purported safety remedy in the hands of consumers.

21.    Defendants offer purchasers a partial refund of $25, although the original

price averaged around $160.00 for most consumers. More specifically, the terms of the

Recall Notice are set forth on Defendants' websites, as follows:

> You will need to remove the headrest and body support insert (if included) from the seat pad. Follow the instructions here or watch this brief video  for information about how to remove

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

**CLASS ACTION COMPLAINT**

and properly destroy the headrest and body support insert (if included) from your swing.

Upload a digital photo of your headrest and body support insert (if included) with your unique case number and the word "RECALL" handwritten in permanent dark-colored marker directly onto the back of each of the cut pieces of the headrest and body support insert (if included).

Photos that have been digitally altered or do not have your unique case number written on the headrest and body support insert (if included) will not be accepted.

22.    Purchasers who qualify cannot redeem their partial refund until they "remove the headrest and body support insert" and "properly destroy" them according to the Defendants' instructions, take a photo of the headrest and body support insert with their case number and "RECALL" written on the back of the cut pieces, and upload those photos with the online recall submission form, which also must be completed, found on Defendants' website.[10] These modifications to the Product significantly diminish (if not eliminate) its value. Moreover, they burden consumers who are already living busy lives caring for their children and are neither trained nor experienced in designing infant products, unlike Defendants.

23.    Consumers like Plaintiff O'Rourke, who own more than one swing—a common occurrence—cannot seek a refund through the website and must take additional steps to contact Fisher-Price for additional service.

24.    The Recall Notice is inadequate for at least two reasons. <u>First</u>, the Defendants failed to recall the entire Product and instead only advised consumers to remove certain portions of it. Accordingly, the Recall Notice fails to prevent the risks

---

[10] *Fisher-Price      Snuga      Infant      Swings*,    Mattel.com, https://consumersupport.mattel.com/mattelsupport/s/recall?recallnumber=Swings (Last accessed November 13, 2024).

**CLASS ACTION COMPLAINT**

associated with infant sleep presented by the dangerously defective Product, contrary to Defendants' misrepresentations and omissions related to safety. By failing to recall the entire Product, Defendants allow and encourage consumers to continue to use a product that has already led to multiple infant deaths. <u>Second</u>, the Recall Notice is wholly ineffective in providing consumers an adequate monetary remedy for purchasing the dangerously defective and misrepresented Products. Consumers paid an average retail price of $160 for the Products, but Defendants have provided consumers with a $25 reimbursement, representing a mere fraction of the purchase price.

25.     The very same day Defendants issued the Recall Notice, the CPSC issued the statement, "Commissioner Trumka Warns That Fisher-Price's Snuga Recall Notice Is Not Good Enough to Keep Babies Safe; Multiple Babies Dead."[11] CPSC Commissioner Trumka explained that Defendants' Recall Notice is inadequate as follows (emphasis added):

> I absolutely agree that Fisher-Price Snuga Swings need to be recalled—they are tied to multiple infant sleep deaths. However, **I believe that the flawed recall that Fisher-Price is announcing today is doomed to fail and will keep many babies in harm's way.**

26.     Commissioner Trumka further states that he fears "this dangerous approach will keep babies at risk of death just to save Fisher-Price money—**a horrible example of putting profit over people.**"[12]

27.     Consumer Reports released an article on the same day, October 10, 2024, stating, "CR's safety experts welcome the recall because it's now illegal for anyone to

---

[11] *Commissioner Trumka Warns That Fisher-Price's Snuga Recall Is Not Good Enough to Keep Babies Safe; Multiple Babies Dead*, CPSC.gov, https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Commissioner-Trumka-Warns-That-Fisher-Price%E2%80%99s-Snuga-Recall-Is-Not-Good-Enough-to-Keep-Babies-Safe-Multiple-Babies-Dead (Last accessed November 13, 2024).
[12] *Id.*

**CLASS ACTION COMPLAINT**

sell any Snuga Swing listed in today's announcement. But they also say the recall doesn't go far enough to help families protect their children and ensure that consumers are made whole for spending money on a product that turned out to be hazardous."[13]

28.    The existence of the Defect is a material fact that reasonable consumers, including Plaintiffs and Class Members, would have considered when deciding whether to purchase the Products. Before purchasing the Products, they did not know that the Products had the Defect and that, contrary to Defendants' misrepresentations and omissions related to Product safety, using the Products for their intended and foreseeable purpose would place their infant children in unreasonably dangerous sleeping positions and compromise their safety.

29.    According to Defendants, since at least October 2010, they have sold approximately 2.1 million Products to consumers who purchased the Products in reliance on Defendants' misrepresentations and omissions as alleged herein, and which became part of the basis of their bargain with Defendants.[14]

30.    Prior to the Recall, the Products were sold in brick-and-mortar stores such as Toys R Us, Walmart, Sams Club, and Target, as well as major online authorized retailers' websites, including Amazon.com, Walmart.com, and Target.com nationwide.[15] The base retail pricing of the Products was approximately $160.[16]

31.    Due to Defendants' misrepresentations and omissions regarding the safety of the Products, Plaintiffs and all reasonable consumers expected the Products to be

---

[13] *Over 2 Million Fisher-Price Snuga Baby Swings Recalled for Suffocation Risk*, ConsumerReports.com, https://www.consumerreports.org/babies-kids/baby-product-recalls/fisher-price-snuga-baby-swings-recalled-for-suffocation-risk-a2341467743/?msockid=19f2d5f7732f63fe1135c60c725462ca    (Last accessed November 13, 2024).
[14] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, *supra* n. 4.
[15] *Id.*
[16] *Id.*

**CLASS ACTION COMPLAINT**

suitable for infant sleep and paid a premium for that important quality. Defendants can charge this premium price for the Products due to the representations and omissions regarding safety, as Defendants know that safety and suitability for infant use, which naturally (and foreseeably) includes sleep, is paramount for consumers.

32.    Given the nature of the Products, studies have shown that consumers are willing to pay more for a baby product that is marketed as safe. For example, the latest market report conducted by Transparency Market Research, a business consulting firm, revealed that "[m]anufacturers of baby care products are focusing more on quality and innovation as parents are willing to pay more for high quality and safe baby care products. Furthermore, aggressive marketing strategies of companies through online and offline advertising, and various promotional activities are substantially driving the global baby care products market."[17]

33.    Defendants' false and misleading marketing of these dangerous Products, and knowing failure to disclose the grave risks of allowing infants to sleep in the Products, allowed Defendants to reap vast profits at the expense of consumers who erroneously believed they were giving their babies a safe place to be soothed to sleep.

34.    Had Plaintiffs and Class Members known about the Defect and the associated fatal risks of unsafe sleeping conditions caused by the Defect, they would not have purchased the Product or would have paid significantly less for it.

35.    Plaintiffs, on behalf of themselves and Class Members, seek damages and all other relief available under law and equity from Defendants, including punitive damages. Plaintiffs also seek class-wide injunctive relief, including: (i) a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products; (ii) the implementation of a corrective advertising campaign to alert

---

[17] Baby Care Products Market Outlook 2031, Transparency Market Research, Inc., https://www.transparencymarketresearch.com/baby-care-products-market.html (Last accessed November 13, 2024).

caregivers to the dangers of inclined swings marketed for infant sleep, including the Products, and educating them about the standards for safe infant sleep; and/or (iii) an offer to replace the Products with a reasonable and safe infant product.

**PARTIES**

**PLAINTIFFS**

36.     At all relevant times, Plaintiff Valerie Gates has resided in Fulton, New York and is a citizen of New York. Plaintiff Gates purchased a Sweet Snugapuppy™ Swing in or around late 2021 from Target for approximately $160.

37.     Prior to her purchase, Ms. Gates read and relied upon Defendants' advertising and marketing materials, including the misrepresentations and omissions related to safety alleged herein, which she understood to mean the Product was a safe and suitable environment for infants to sleep in. Ms. Gates would not have purchased or used the Sweet Snugapuppy™ Swing had she known that it was unsafe for its intended, marketed and/or reasonably foreseeable use; that it was dangerous; and that it exposed her baby to the risk of injury and death.

38.     Ms. Gates was forced to completely discontinue her use of the Product when the Defect was discovered due to the ongoing safety risk of placing her infant in an unsafe sleeping environment.

39.     To the best of her knowledge, Ms. Gates did not receive a Recall Notice from Defendants. However, if she had, she would not have been made whole by the $25.00 partial refund because it is an inadequate remedy. The purported solution to the defective Products is insufficient and has diminished if not entirely eliminated the valued of the Products

40.     At all relevant times, Plaintiff Phlecia McCrea has resided in Hartsville, South Carolina and is a citizen of South Carolina. Plaintiff McCrea purchased a Snugabear™ Cradle Swing in or around 2021 from Wal-Mart for approximately $150.00.

**CLASS ACTION COMPLAINT**

41.     Prior to her purchase, Ms. McCrea read and relied upon Defendants' advertising and marketing materials, including the misrepresentations and omissions related to Product safety alleged herein, which she understood to mean the Product was a safe and suitable environment for infants to sleep in. Ms. McCrea would not have purchased or used the Snugabear™ Cradle Swing had she known that it was unsafe for its intended, marketed and/or reasonably foreseeable use; that it was dangerous; and that it exposed her baby to the risk of injury and death.

42.     Ms. McCrea was forced to completely discontinue her use of the Product shortly after her purchase when the Defect was discovered due to the ongoing safety risk of placing her infant in an unsafe sleeping environment.

43.     To the best of her knowledge, Ms. McCrea did not receive a Recall Notice from Defendants. However, if she had, she would not have been made whole by the $25.00 partial refund because it is an inadequate remedy. The purported solution to the defective Products is insufficient and has diminished the valued of the Products.

44.     At all relevant times, Plaintiff O'Rourke has resided in Charleston, Illinois and is a citizen of Illinois.  In 2023, Plaintiff O'Rourke purchased three of the Products for her triplets, including the Sweet Snugamonkey Swing and Peek-a-boo Fox Swing, from Wal-Mart.

45.     Prior to her purchase, Ms. O'Rourke read and relied upon Defendants' advertising and marketing materials, including the misrepresentations and omissions regarding product safety alleged herein, which she understood to mean the Product was a safe and suitable environment for infants to sleep in. Ms. O'Rourke would not have purchased or used the Sweet Snugamonkey Swing had she known that it was unsafe for its intended, marketed and/or reasonably foreseeable use; that it was dangerous; and that it exposed her baby to the risk of injury and death.

46.    Ms. O'Rourke was forced to completely discontinue her use of the Product shortly after her purchase when the Defect was discovered due to the ongoing safety risk of placing her infant in an unsafe sleeping environment.

47.    To the best of her knowledge, Ms. O'Rourke did not receive a Recall Notice from Defendants. However, if she had, she would not have been made whole by the $25.00 partial refund because it is an inadequate remedy. The purported solution to the defective Products is insufficient and has diminished, if not entirely eliminated, the value of the Products.

**DEFENDANTS**

**Fisher-Price, Inc.**

48.    Defendant Fisher-Price is a Delaware corporation with its principal place of business in East Aurora, Erie County, New York. Fisher-Price designs, manufactures, distributes, markets, advertises, labels, and sells products for the care of infants and preschool children to consumers throughout the United States.

49.    Fisher-Price is a wholly-owned subsidiary of Mattel. The website on which Defendants advertised their Snuga Swings includes Mattel's name: https://fisher-price.mattel.com.

**Mattel, Inc.**

50.    Defendant Mattel is a Delaware corporation with its principal place of business in El Segundo, California. Mattel is the world's second-largest toy maker and the parent company of Fisher-Price. On its annual filings with the Securities Exchange Commission, Mattel references Fisher-Price as a "brand" in "Mattel's portfolio of iconic brands."[18]

---

[18] *See, e.g.*, Mattel, Inc., 2018 10-K, at 4 (February 21, 2023), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000063276/a8e997d5-5ae2-4b5b-be6c-54db4ce61f91.pdf (Last accessed November 13, 2024).

**CLASS ACTION COMPLAINT**

51.    Until January 2024, Mattel directly and/or through Fisher-Price designed, manufactured, distributed, marketed, advertised, labeled, and sold its line of Snuga Swings, and the Products, in all 50 states.

52.    Mattel shares overall responsibility for the safety of Fisher-Price products, including the Snuga Swings. All recall notices and safety alerts for both Fisher-Price and Mattel products, as well as customer service for both Fisher-Price and Mattel products, are found on the Mattel website.

53.    Mattel wholly owns Fisher-Price and includes its results on its SEC filings. On Mattel's financial filings, it describes Fisher-Price as a "brand," part of the "Infant, Toddler, and Preschool Segment" represented in Mattel's gross sales.[19]

54.    Mattel, at all relevant times, had senior executives with control over, involvement in and oversight of Fisher-Price, with titles such as "Executive Vice President – Fisher-Price Global Brands," and "Executive Vice President - Fisher-Price Global Brand Marketing."

55.    Moreover, the instruction manuals for the Products were posted on Mattel's website.[20]

56.    Mattel bears responsibility for failing to recall the Products in a timely manner and for the inadequate recall. Mattel was directly involved in all recalls of Fisher-Price products.

57.    Mattel's corporate headquarters is in California, and California is the nerve center of Defendants' actions (and inactions) subject to this litigation. Mattel is a citizen of California.

## JURISDICTION AND VENUE

58.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act because: (1) there are 100 or more

---

[19] *Id.*

[20] m.service.mattel.com/us/Technical/productDetail?prodno=CMR45&siteid=27

**CLASS ACTION COMPLAINT**

putative Class Members; (2) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (3) there is diversity because Plaintiffs and at least one Defendant are citizens of different states.

59.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

60.    This Court has personal jurisdiction over Defendants because Defendants do substantial business in this State and within this District, receive substantial compensation and profits from the marketing, distribution, and sale of products in this District, and have engaged in the unlawful practices described in this Complaint within this District.

61.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendants regularly transact business in this District, and Defendants have intentionally availed themselves of the laws and markets within this District. Also, Defendant Mattel is headquartered here, making this venue the nerve center of this litigation.

## COMMON FACTUAL ALLEGATIONS

### A. Defendants' Deceptive and Misleading Safety Representations and Omissions

62.    Defendants regularly make numerous misrepresentations and omissions regarding safety, including promises about Defendants' Products' safety and suitability for infant sleep, directly to consumers through various channels like their websites, retail websites, and YouTube Channel, among other avenues.

63.    These representations can even be included names of the Products themselves, such as the "Cradle 'n Swing," which communicates to reasonable consumers that the Products may be used not just as a swing or a seat but as a *cradle*, leading reasonable consumers, including Plaintiffs, to reasonably conclude that the Products are suitable for infant sleep.

**CLASS ACTION COMPLAINT**

1

2

3

64.    Further, Defendants' misrepresentations and omissions regarding safety included clear visual representations of infants sleeping in the Products on its authorized retailer's websites, such as Amazon.com, as demonstrated below:



\* \* \*

65.    Even more, while Defendants could have issued a warning in the user manual cautioning against using the Products for infant sleep at any time, they instead caution only against using the Products for *prolonged* periods of sleep.[21] This limited warning further demonstrates that Defendants knew and expected that consumers would foreseeably use the Product for infant sleep, despite Defendants' knowledge of the attendant risks of such use.

---

[21] *See, e.g.*, Fisher Price DRG43 User Manual located at: https://m.media-amazon.com/images/I/A1Qm1C6kM1L.pdf (Last accessed November 13, 2024).

**CLASS ACTION COMPLAINT**

66.    Defendants know that safety is the chief concern of parents and caregivers, which is why Defendants' misrepresentations and omissions regarding safety are intentionally designed to deceive reasonable consumers to pay a safety premium for the Products.

67.    As described below, for over 90 years, Fisher-Price has garnered consumers' trust by marketing its products as good quality baby products, which are, above all, *safe*. Fisher-Price states that it is the "#1 infant and preschool company in the world" and "the only kid brand committed to all the years between 0 and 5."[22]

68.    Fisher Price consistently misleads consumers of Products by making safety a central component of its brand image.

69.    For example, up until at least July 2019, Defendant Fisher-Price had a webpage dedicated to safety.[23] This page, titled "A Safety Story," states:

**It All Starts With Safety**

> Squeals of delight, sighs of contentment, giggles of joy . . . those are some of the reactions we hope for from families using our babygear and toys. There's a less visible one, too: peace of mind. "Parents have trusted us for more than 80 years to provide safe products for their children, but we know we must still earn their trust every day," says Kitty Pilarz, Vice President of Product Safety & Regulatory Compliance at Fisher-Price. 'So, right from the start of a design concept, we work to make sure our products are as safe as they can be.'

70.    This is false because the Products are not "as safe as they can be," and instead are dangerous for sleep, the purpose for which they are advertised.

---

[22] https://corporate.mattel.com/brand-portfolio/fisher-price (Last accessed November 13, 2024).
[23] https://web.archive.org/web/20190729085651/https://www.fisher-price.com/en_US/ourstory/safety/index.html (Last accessed November 13, 2024).

**CLASS ACTION COMPLAINT**

71.    Today, Defendant Fisher-Price has a similar webpage dedicated to safety that employs analogous messages about its brand's "commitment to safety" to market its products to consumers and grow its wealth without regard for the truth:[24]

### Our Commitment to Safety

Fisher-Price is committed to building relationships with children and earning the trust of their parents and caretakers. Since our founding, safety has been our highest priority. For more than ninety years, we have maintained an unrelenting focus on product safety, quality, and compliance. We are proud that families and children choose Fisher-Price again and again to make childhood more joyful and support parents through the early months and years of their babies' lives.

72.    The overarching message on Defendant Mattel's website is also safety. As shown below, the website states that the most important part of creating its products is ensuring they are safe and that its internal product safety procedures are designed to meet or exceed applicable regulations and laws.[25]

### Product Quality and Safety

Product quality and safety are key to the bedrock of trust we establish with millions of families who buy and play with our products every day. The development and construction of new products involves numerous disciplines and multiple areas of expertise devoted to ensuring the quality and safety of our products before they go to market, as well as ensuring they meet or exceed all applicable standards.

73.    Parents' trust is essential for Defendants' success. Defendants advertise their commitment to safety by ensuring their products comply with all safety standards.

---

[24] *Safe Start,* Mattel.com, https://shop.mattel.com/pages/safe-start (Last accessed November 13, 2024).

[25] *Id.*

**CLASS ACTION COMPLAINT**

74.    Specifically, in 2019 and in response to the recall of the Fisher-Price Rock-n-Play Sleepers, Chuck Scothon, General Manager of Fisher-Price stated, "we want parents around the world to know that safety will always be a cornerstone of our mission, that we are committed to these values, and will continue to prioritize the health, safety and well-being of the infants and preschoolers who utilize our products."[26]

75.    As a result of Defendants' decades-long marketing scheme, including the misrepresentations and omissions regarding safety alleged herein, consumers recognize the Fisher-Price and Mattel brands as reliable sources for safe infant products. Consequently, these consumers reasonably rely on Defendants to produce *safe,* reliable infant products.

**B. Defendants Knew Their Products Could Not Conform to Safe Sleeping Requirements.**

76.    Defendants are keenly aware of the fact that safe sleep is a top priority for parents and acknowledge explicitly that infants should sleep on their backs on a flat and firm sleeping surface in the Recall[27]:

> CPSC continues to urge consumers to place infants on their backs for sleep. The best place for an infant to sleep is on a firm, flat surface in a crib, bassinet, or play yard, with nothing but a fitted sheet. Infants who fall asleep in an inclined or upright position should be moved to a safe sleep environment with a firm, flat surface such as a crib, bassinet, or play yard. In 2022, Congress enacted the Safe Sleep for Babies Act, under which inclined sleepers for infants are banned hazardous products.

---

[26] *Fisher-Price Rock 'n Play sleepers recalled as officials confirm over 30 infant deaths*, CNN.com, https://www.cnn.com/2019/04/12/us/fisher-price-rock-n-play-sleeper-recall/index.html (Last accessed November 13, 2024).
[27] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, *supra* note 4.

**CLASS ACTION COMPLAINT**

77.     Contrary to Defendants' promises to consumers that the Products are a safe sleep environment for infants, the Defect in the Products renders them completely unsuitable for infant sleep at all.

78.     Per the recommendation of the CPSC, AAP, NICHD, and the U.S. Surgeon General, infants should be put to sleep on their backs instead of their stomachs or sides. The AAP, CPSC, NICHD and U.S. Surgeon General have made these recommendations because studies show that the risk of Sudden Infant Death Syndrome ("SIDS") increases when infants sleep facing downward in a prone position.[28]

79.     In addition to placing babies on their backs to sleep, the CPSC and AAP recommend that infant sleep products conform to the Firm/Flat Standard so that infants can effectively remain on their backs and not roll to their sides or fronts until developmentally appropriate.[29]

80.     Like the CPSC and AAP, NICHD also recommends that parents and caregivers can "reduce [their] baby's risk for Sudden Infant Death Syndrome (SIDS) and other sleep-related deaths, such as from accidental suffocation" by using a "firm, flat, and level" sleep surface.[30]

---

[28] Mitchell EA, et al. *Changing Infants' Sleep Position Increases Risk of Sudden Infant Death Syndrome. New Zealand Cot Death Study*. Arch. Pediatr. Adolesc. Med., 153(11):1136-41. (1999), https://pubmed.ncbi.nlm.nih.gov/10555714/ (Last accessed November 13, 2024).

[29] *See CPSC Approves Rules Implementing Bans on Inclined Sleepers for Infants and Crib Bumpers Rules Aim to Save Lives and Result in a Safer Marketplace for Parents and Babies*, (August 7, 2023) https://www.cpsc.gov/Newsroom/News-Releases/2023/CPSC-Approves-Rules-Implementing-Bans-on-Inclined-Sleepers-for-Infants-and-Crib-Bumpers (Last accessed November 13, 2024).

[30] *What Does A Safe Sleep Environment Look Like?*, NIH.GOV, (August 2022) NIH Pub.                                No.                                22-HD-5759, https://safetosleep.nichd.nih.gov/resources/caregivers/environment/look (Last accessed November 13, 2024).

**CLASS ACTION COMPLAINT**

81.     Defendants knew or should have known of the risks of designing, manufacturing, marketing, distributing and selling the Products using the misrepresentations and omissions regarding safety when the Products suffered from the Defect, which does not provide a firm, flat, level sleeping surface. The Products as marketed and sold by Defendants could not and did not meet safe sleeping standards.

82.     Nonetheless, Defendants failed to remedy the Defect or make any effort to redesign the Products to conform to their representations and omissions regarding safety.

83.     Moreover, Defendants' Recall Notice fails to address the risks presented by the defective Products and, instead, continues to put infant children at risk of serious injury or death. Defendants failed to disclose the Defect to Plaintiffs and Class Members at the time of purchase or thereafter, and despite admitting to the presence of the Defect in the Recall, Defendants continue to represent that the Products can and should be used by its consumers.

84.     The Products are Defective in that they are designed with a sleeping surface that is at a head-to-toe angle or incline. The Defect results in the Products' complete and utter failure to provide an appropriate level or flat sleeping surface, which would allow a baby to sleep safely on their back.

85.     Thus, the defective nature of the Products significantly increases the risk that the infant's head will slide into a dangerous position, tilt to constrict the windpipe, and/or cause the infant's face to become pressed against the padded fabric in the sleeper and block airflow, all of which the infant may be unable to correct. This increases the risk of death by asphyxiation and makes following requisite safe sleep precautions impossible.

86.     Just like the banned Fisher-Price Rock'n'Play Sleepers (designed, manufactured, and sold by the same Defendants in this case) the design of the Products

has the ability to make infants fall into a deeper sleep than normal sleep, which renders them less able to wake up if and when their airflow becomes obstructed.

87.    Thus, the Defect renders every Product unreasonably dangerous and unsuitable for infant sleep at the point of purchase.

88.    The Defect is latent such that no reasonable customer would know, or be able to discover through inspection, that the Product's support structure is defective and presents a risk of danger to children at the time the Product is purchased. However, Defendants knew or should have known of the Defect before it distributed the Products into the consumer marketplace.

89.    Safer alternative designs, including infant sleeping products with a flat and firm sleeping surface, were available to Defendants but not utilized. However, despite the availability and feasibility of these other reasonable alternatives, Defendants intentionally chose to design the Products with an inclined sleeping surface so that they could garner more market share at the expense of consumers.

90.    Plaintiffs and the Class Members have a reasonable expectation that their Products will be safe for infants as advertised.

91.    Further, reasonable consumers expect the Products to be safe and suitable for infant sleep. However, due to the Defect, the Products fail to serve that purpose. Instead, they create an unreasonably dangerous inclined sleeping environment for the infant children of consumers who paid for and expected to receive a safe Product.

*C. Defendants' Express and Implied Warranties*

92.    Defendants, Mattel and Fisher-Price, individually or together, expressly and impliedly warrant, via user manuals[31], advertisements, pamphlets, brochures, circulars, samples, and/or models, that the Products are fit for the ordinary purpose for which they are sold.

---

[31]    Fisher-Price, Model No. DRG43 User Manual, https://m.media-amazon.com/images/I/A1Qm1C6kM1L.pdf (accessed November 13, 2024).

**CLASS ACTION COMPLAINT**

93.    However, as described herein, the Products contain a uniform Defect prior to and at the time of purchase, causing them to commonly and consistently fail in their primary purpose.

94.    Prior to purchasing the Products, Plaintiffs and other Class Members did not know that the Products had the Defect that, contrary to Defendants' misrepresentations and omissions related to safety, would place their infants in an unreasonably dangerous sleeping environment. Further, consumers, including Plaintiffs, had no reason to know that the misrepresentations and omissions regarding safety were deceptive or misleading.

95.    Defendants clearly intended their warranties to apply directly to these consumers, the parents and caregivers who depend on the Defendants to provide reliable infant sleep products.

96.    Defendants' manifest intent that their warranties apply to Plaintiffs and Class Members as third-party beneficiaries is evident from the statements in their product literature, which begins on the date of the consumers' purchases and excludes commercial, non-residential use.

97.    The express and implied warranties relating to the Product collectively and individually are the result of surprise and oppression and are so one-sided and overly harsh such that they are both procedurally and substantively unconscionable.

98.    In addition, the warranty fails of its essential purpose in that (1) the Defect exists at the time the Product leaves the manufacturing facility and (2) Defendants fail to disclose its knowledge of the Defect when contacted by customers about the Product's failures.

*D. The Belated and Inadequate Recall Notice*

99.    On October 10, 2024, after at least five infants died in the Product, Defendants issued the Recall Notice for 2.1 million Products because the Products are unreasonably dangerous for their intended use as an infant sleep product.[32]

100.    The Recall Notice applies to all 21 models and variations of the Product in the United States, Australia, Canada, and Mexico.[33] All 21 models are substantially similar in their forward-facing representations to consumers and are uniform in that they contain the same Defect, as evidenced by their inclusion in the Recall Notice.

101.    The Recall Notice announcement tilted, "Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported,"[34] clearly confirms the existence of the dangerous Defect and that the Product is completely unsafe for infant sleep.[35]

102.    Despite the contradiction between the Defendants' misrepresentations and omissions regarding safety and the Recall, Defendants, instead of recalling the Products in their entirety and advising consumers not to use them any longer, intentionally chose the more profitable route and simply advised consumers to "immediately remove both the headrest (by cutting the tether) and the body support insert from the seat pad before continuing to use the swing for awake-time activities."[36]

103.    The Recall's effect of simply removing the two pieces of padding, the headrest and body support, from the Product completely fails to mitigate the safety risks presented by the Defect and does nothing to keep infant children safe as promised by Defendants.

---

[32] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, *supra* note 4.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*

**CLASS ACTION COMPLAINT**

104.   Because Defendants failed to issue an adequate recall, Commissioner Trumka has gone above and beyond and recommends that consumers "throw this product away; do not keep it in your homes because even after the so-called 'repair' this product will still be unsafe for infant sleep" because he is certain that "if these products remain in homes, many consumers will still use these products for sleep because they have received conflicting instructions over time."

105.   In addition to Commissioner Trumka, CPSC Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle also issued a statement the same day as the Recall, "Joint Statement of Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle Regarding the Recall of more than Two Million Snuga Swings" because they felt it did not go far enough to protect consumers.[37]

106.   As noted above, Consumer Reports has also participated in the public outcry regarding the inadequacies of the Recall Notice, claiming that "the recall doesn't go far enough to help families protect their children and ensure that consumers are made whole for spending money on a product that turned out to be hazardous."[38]

107.   In addition to the Recall's failure to remove the entire Product from the marketplace, consumers will not be compensated for all costs they incurred in connection with the Product.

---

[37] *Joint Statement of Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle Regarding the Recall of more than Two Million Snuga Swings*, CPSC.gov, https://www.cpsc.gov/About-CPSC/Chairman/Alexander-Hoehn-Saric-Mary-T-Boyle/Statement/Joint-Statement-of-Chair-Alexander-Hoehn-Saric-and-Commissioner-Mary-T-Boyle-Regarding-the-Recall-of-more-than-Two-Million-Snuga-Swings (Last accessed November 13, 2024).

[38] *Over 2 Million Fisher-Price Snuga Baby Swings Recalled for Suffocation Risk*, ConsumerReports.com, https://www.consumerreports.org/babies-kids/baby-product-recalls/fisher-price-snuga-baby-swings-recalled-for-suffocation-risk-a2341467743/?msockid=19f2d5f7732f63fe1135c60c725462ca (Last accessed November 13, 2024).

**CLASS ACTION COMPLAINT**

108.    Consumers paid approximately $160 or more for the each of the Products, however, the Recall Notice only provides for reimbursement of a mere $25. This small amount is completely inadequate under the circumstances. It does not account for the total cost of the Product, nor does it make up for the taxes (without a receipt), shipping, handling and other charges paid when the original purchase of the product was made and further, it does not include costs associated with stopping use of the Product after the announcement of the Recall Notice such as replacing it with a different product that is safe for infant sleep.

109.    Thus, the Defendants' Recall Notice is ineffective in providing consumers the proper monetary relief for their purchases of the dangerously defective and misrepresented Products and does nothing to stop infants from dying in the Products.

110.    Moreover, it is well known that product recalls generally have a low level of participation when consumers are asked to deconstruct and physically destroy parts of the Products, but to continue using them in this destructed form.

**E. Defendants Actual or Constructive Knowledge of the Defect**

111.    Defendants knew or should have known when they sold the Products to the public that they suffered from the Defect, and that the Defect caused them to function improperly during their expected useful life, created an unsafe and dangerous sleeping environment for infants, and increased the potential for serious harm and/or death to the infant children.

112.    Defendants' knowledge of the Defect is established through their Recall, which states that babies have been dying in the Products since at least 2012.[39]

113.    Despite its knowledge, upon information and belief, Defendants did not remedy or eliminate the Defect in the Products or remove the Products from the stream

---

[39] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, *supra* note 4.

**CLASS ACTION COMPLAINT**

of commerce. Instead, Defendants continued to unlawfully advertise the Products as safe and to sell the unreasonably dangerous Products to consumers.

114.    In conjunction with Defendants' vast experience with infant sleep products, these facts and reports of infant death illustrate that Defendants knew or should have known of the Defect and the resulting incapability of the Products to conform to their misrepresentations and omissions regarding safety.

115.    Defendants must disclose the Defect and to not conceal the Defect from Plaintiffs and Class Members. Defendants' failure to disclose, or active concealment of, the Defect places Plaintiffs and Class Members' infants at risk of serious injury and/or death.

116.    Defendants, even in light of the Recall, are currently still allowing the sale of the defective Product.

117.    Had Plaintiffs, Class Members, and the consuming public known that the Product was defective, unsuitable for safe infant sleep, and risks their infant children's lives, they would not have purchased it.

118.    Defendants have wrongfully placed on Plaintiffs and Class Members the burden, expense, and difficulty involved in discovering the Defect and determining that the Products are unsafe and paying for the cost of damages caused by the Defect.

*F. Injury to the Public-at-Large and Potential Future Harm*

119.    By misrepresenting the Product as safe or suitable for infant sleep and by failing to disclose that the Product contains a uniform Defect and exposes infants to the risk of serious injury and death, Defendants continue to harm all Class Members and consumers who may purchase the Product.

120.    In addition, because Defendants continue to encourage consumers to use the Product as described herein, Defendants' actions pose an ongoing risk to the public.

121.    As such, a public injunction is necessary to enjoin Defendants' continued harm of consumers and the public-at-large.

**CLASS ACTION COMPLAINT**

122.   Similarly, should Defendants not be enjoined from their unlawful and deceptive conduct, Plaintiffs and Class Members face the potential for irreparable future harm, including purchasing the Product which is not safe or suitable for infant sleep and instead contains a uniform Defect and exposes infants to the risk of serious injury and death.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

123.   Defendants have continuously marketed and sold the dangerous Products to unsuspecting parents and caregivers of infants. They continuously represented that the Product is safe and suitable for infant sleep.

124.   By continuously repeating these false representations and failing to disclose that the Product is not safe or suitable for infant sleep, contains a uniform Defect, and exposes infants to risk of serious injury and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Defendants might seek to apply.

125.   As the creator and manufacturer of the Product, Defendants have had actual knowledge since at least 2010 that the Product is defectively designed and exposes infants to great risk of serious injury and death.

126.   Defendants' knowledge of the Defect is evidenced by, amongst other things, the Recall Notice and reports of infant death in the Product.

127.   Thus, at all relevant times, Defendants indisputably possessed continuous knowledge of the material dangers posed by the Product, and yet Defendants knowingly continue to allow the sale of the Product. Plaintiffs' and other Class Members' claims are not time barred.

128.   Moreover, even after the Recall, there is no evidence that news of the Recall Notice reached all owners of the Products.

129.   Plaintiffs and other Class members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to

**CLASS ACTION COMPLAINT**

suspect that Defendants knowingly failed to disclose material information within their knowledge about a dangerous defect to consumers in the United States and elsewhere. Therefore, no potentially relevant statute of limitations should apply.

130.    Throughout the time period relevant to this action, Defendants concealed from and failed to disclose to Plaintiffs and the other Class Members vital information about the Defect described herein.

131.    Defendants kept Plaintiffs and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the Defect, even upon reasonable exercise of due diligence.

132.    Further, Defendants create consumer confusion in their deficient Recall, encouraging consumers to continue to use the dangerous Product.

133.    Defendants had a duty to disclose to Plaintiffs and the Class Members the true quality and nature of the Product, that the Product has a uniform dangerous Defect, and that it poses safety concerns and is in fact dangerous.

134.    This duty arose, among other things, from Defendants' explicit representations that the Product was safe and suitable for infant sleep.

135.    Throughout the Class Period, at all relevant times, Defendants have known that the Product, which they designed, manufactured, selected materials for and sold, contained the Defect resulting in premature failure in its essential purpose, and posed serious safety risks to infants.

136.    Defendants' actual knowledge of the serious safety risks created by the use of the Product is evidenced by, among other things, Defendants' misrepresentations and omissions regarding safety and the reports of five infant deaths in the Product since 2012.

137.    Despite Defendants' knowledge of the Defect and serious safety issues posed by the Product when used as intended, Defendants failed to disclose and

**CLASS ACTION COMPLAINT**

concealed this material information from Plaintiffs and other Class Members, even though, at any point in time, they could have disclosed the Defect through an earlier recall, individual correspondence, media release, or by other means.

138.    Instead, Defendants continued to market the Product as suitable for its intended purpose as a safe environment for soothing infants to sleep.

139.    The purpose of Defendants' concealment of the dangers was to continue to profit from the sale of their popular Product and to prevent Plaintiffs and other Class Members from seeking redress.

140.    Plaintiffs and the other Class Members justifiably relied on Defendants to disclose the true nature of the Product they purchased and/or owned because that Defect was not discoverable by Plaintiffs and the other Class Members through reasonable efforts.

141.    Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which is ongoing. To this day, Defendants continue to insist the Product is safe when the body support insert is removed.

142.    Plaintiffs and other Class Members could not have discovered through the exercise of reasonable diligence that their Product was defective within the time-period of any applicable statutes of limitation.

143.    Among other things, neither Plaintiffs nor the other Class Members knew or could have known that the Product contains the Defect.

144.    There is no evidence that Plaintiffs were aware of the Product's dangerous Defect and safety risks. Defendants have concealed and misrepresented the dangerous Defect in the Product and the risks that were posed by that Defect.

145.    Plaintiffs and other Class Members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to

suspect that Defendants knowingly failed to disclose material information within their knowledge about a dangerous Defect to consumers in the U.S. and elsewhere.

146.   As such, no potentially relevant statute of limitations should be applied.

## **CLASS ACTION ALLEGATIONS**

147.   Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and the members of the following proposed nationwide class ("**Nationwide Class**"):

> **During the fullest period allowed by law, all persons who purchased the Products in the United States for personal use and not resale.**

148.   Plaintiff Gates brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following proposed New York class ("**New York Subclass**"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of New York for personal use and not for resale.**

149.   Plaintiff O'Rourke brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following proposed Illinois class ("**Illinois Subclass**"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of Illinois for personal use and not for resale**

150.   Specifically excluded from these definitions are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class

Counsel. Plaintiffs reserve the right to amend the Class and/or Subclass definitions as necessary.

151.    Plaintiffs seek only damages and equitable relief on behalf of themselves and the putative Classes. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiffs and/or putative Class Members.

152.    Plaintiffs reserve the right to modify the class definitions, if necessary, to include additional products made by Defendants with the same Defect and/or other products manufactured by Defendants with the common Defect but bearing different brand names.

153.    **Numerosity:** The Members of the Class and Subclasses are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least thousands of people throughout the United States and the state(s) of Illinois, New York, and South Carolina as 2.1 million Products were sold. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Defendants and its authorized distributor and retailers.

154.    **Typicality:** The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased a Product that was manufactured, marketed, advertised, distributed, and sold by Defendants. Plaintiffs, like all Class Members, were damaged by Defendants' uniform misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for the Product that was manufactured with the Defect, which makes it unusable, inherently dangerous, and not fit for its intended use, and which is subject to an inadequate recall. Furthermore, the factual basis of Defendants' misconduct is common to all Class

**CLASS ACTION COMPLAINT**

Members because it engaged in systematic fraudulent behavior that was deliberate, as well as negligent misconduct, and results in the same injury to all Class Members. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Classes they seek to represent.

155.  **Commonality:** Common questions of law and fact exist as to all Members of the Classes. These questions predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Classes. Such common legal or factual questions include, *inter alia*:

a.  Whether the Products are defectively designed and/or manufactured;

b.  Whether Defendants knew or should have known about the Defect in their Products prior to distributing and selling them to Plaintiffs and Class Members;

c.  Whether Defendants concealed from and/or failed to disclose to Plaintiffs and Class Members that the Products contained a uniform Defect;

d.  Whether Defendants failed to adequately warn Plaintiffs and Class Members that the Products contained the Defect, were not safe or suitable for infant sleep, and placed infants at a significant risk of injury and/or death;

e.  Whether Defendants engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Products containing the Defect;

f.  Whether Defendants' claims about the Products being safe and suitable for infant sleep including back sleep are reasonably likely to deceive;

g.  Whether Defendants' claims about the Products being safe and suitable for infant sleep including back sleep are material to reasonable consumers;

h.  Whether Defendants concealed from and/or failed to disclose to Plaintiffs

**CLASS ACTION COMPLAINT**

and Class Members that the Products are not safe and not suitable for infant sleep;

i.    Whether Defendants have violated consumer protection statutes;

j.    Whether Defendants have been unjustly enriched;

k.    Whether Defendants breached the implied and express warranties relating to the Products;

l.    Whether Plaintiffs and the members of the Class are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount and nature of such damages; and

m.    Whether Plaintiffs and the members of the Class are entitled to injunctive, declaratory, or other equitable relief including enjoining Defendants from selling and marketing the Products containing the Defect.

156.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and other Class Members. Similar or identical statutory violations, common law wrongs, business practices, and injuries are involved. Individual questions, if there are any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

157.    **Adequate Representation:** Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer products, product defects, misrepresentation, mislabeling, and class actions, and Plaintiffs intend to prosecute this action vigorously.

158.    **Injunctive/Declaratory Relief:** The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and Plaintiffs and Class Members will continue to be deceived by Defendants' misrepresentations and omissions and unknowingly be exposed to the risk of serious

**CLASS ACTION COMPLAINT**

and life-threatening harm associated with the Product. Defendants have acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief, public injunctive relief, and corresponding declaratory relief are appropriate respecting the Class as a whole. Injunctive relief, and specifically public injunctive relief, is necessary in this action.

159.  Plaintiffs further seek injunctive and declaratory relief requiring Defendants to cease their unfair, deceptive, and unlawful conduct, including a complete recall of the entire product and full reimbursement for the full purchase price. Plaintiffs also seek a declaration that the Product suffers from the Defect and that all warranties cover the Defect, which existed at the time of sale of the Product to consumers, which was known to Defendants and unknown to consumers.

160.  Plaintiffs and Class Members have been harmed and will experience irreparable future harm should Defendants' conduct not be enjoined because they will continue to use the Product, which still contains the Defect even if the headrest and body support are removed as instructed by the Recall.

161.  **Predominance and Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high given the average price point of the Product and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

162.    The claims presented in this case predominate over any questions of law or fact affecting individual Class Members

163.    Plaintiffs knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

164.    Defendants implemented uniform procedures relating to the Recall, which resulted in uniform damage to Plaintiffs and Class Members. As a result, Defendants have acted or refused to act on grounds generally applicable to each Class Member, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

## COUNT I
**Violations of The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS §§ 505-1, *et seq*.**
**(Plaintiff O'Rourke Individually and on Behalf of the Illinois Subclass)**

165.    Plaintiff O'Rourke, individually and on behalf of the Illinois Subclass, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

166.    The conduct described herein constitutes unfair methods of competition or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS §§ 505-1, *et seq*.

167.    Plaintiff and Illinois Subclass Members are "persons" within the context of 815 ILCS § 505-1(c).

168.    Defendants are "persons" within the context of the ICFA, 815 ILCS § 505/1(c).

169.    At all times relevant hereto, Defendants were engaged in trade or commerce as defined under the ICFA, 815 ILCS § 505/1(f).

**CLASS ACTION COMPLAINT**

170.   Plaintiff O'Rourke and the Illinois Subclass members are "consumers" who purchased the Products for personal, family, or household use within the meaning of the ICFA, 815 ILCS § 505/1(e).

171.   The ICFA prohibits engaging in "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." ICFA, 815 ILCS § 505/2.

172.   The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices, including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

173.   Plaintiff O'Rourke and the other Illinois Subclass Members reasonably relied upon Defendants' misrepresentations and omissions alleged herein regarding the Products, specifically regarding the safety of the Products for infant sleep.

174.   Defendants' conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA § 505/1, *et seq.*

175.   Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

176.   Defendant advertised the Products with the intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

177.   Defendant engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

178.   Before placing the Products into the stream of commerce and into the hands of consumers, including Plaintiff and reasonable consumers, Defendants knew

**CLASS ACTION COMPLAINT**

or should have known that the Products had a serious defect, and were otherwise not able to safely or reliably function as intended and created a serious risk of infant injury or death, but Defendants omitted and concealed this material fact to consumers, including Plaintiffs and Illinois Subclass members, by continuing to place the Products into the stream of commerce without any notice or disclosure of the material defect.

179.    Defendants chose to market the Products in this way to impact consumer choices and gain market share. They are aware that all consumers who purchased the Products were exposed to and would be affected by their misrepresentations and omissions and would reasonably believe that the Products safely and reliably functioned and were safe for use by the user, and that Defendants' marketing materials, including representations and omissions, were otherwise accurate. However, Defendants' representations are false and misleading because the Products contain a material defect, are not safe for use by its user, and do not function safely or reliably.

180.    Defendants then chose to remedy this material defect by providing consumers with an inadequate recall procedure.

181.    Defendant intended that Plaintiffs and each of the other Illinois Subclass members would reasonably rely upon the representations, misleading characterizations, and material omissions concerning the true nature of the Products.

182.    Defendants' representations, concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or cause Plaintiffs and the other Illinois Subclass members to be deceived about the true nature of the Products.

183.    Plaintiff O'Rourke and Illinois Subclass Members have been damaged as a proximate result of Defendants' violations of the ICFA. They have suffered damages as a direct and proximate result of purchasing the Products.

184.    As a direct and proximate result of Defendants' violations of the ICFA, as set forth above, Plaintiff O'Rourke and the Illinois Subclass members have suffered

**CLASS ACTION COMPLAINT**

ascertainable losses of money caused by Defendants' representations and material omissions regarding the ability of the Products to function as intended, specifically related to the safety of the Products.

185.   Had they been aware of the true nature of the Noticed Products, Plaintiff O'Rourke and Illinois Subclass Members would have paid less for the Products or would not have purchased them.

186.   Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff O'Rourke and the Illinois Subclass members are entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs, and attorney's fees, under 815 ILCS § 505/10a. Plaintiff O'Rourke and Illinois Subclass members are also entitled to injunctive relief, seeking an order enjoining Defendant's unfair and/or deceptive acts or practices.

### COUNT II
**Violations of New York's Consumer Protection Statute**
**N.Y. Gen. Bus. Law §§ 349 *et seq.***
**(Plaintiff Gates Individually and on Behalf of the New York Subclass)**

187.   Plaintiff Gates, individually and on behalf of the New York Subclass, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

188.   New York General Business Law § 349 ("GBL § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

189.   Defendant's actions regarding manufacturing, marketing, selling and distributing the Products, as described herein, are deceptive acts or practices in the conduct of the business trade or commerce.

190.   N.Y. Gen. Bus. Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name

**CLASS ACTION COMPLAINT**

to enjoin such lawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."

191.  Plaintiff Gates and the New York Subclass Members have been injured by Defendants' violations of the GBL as detailed throughout this Complaint.

192.  Plaintiff Gates and the other New York Subclass Members reasonably relied upon Defendants' misrepresentations and omissions alleged herein regarding the Products, specifically regarding the safety of the Products for infant sleep.

193.  Before placing the Products into the stream of commerce and into the hands of consumers, including Plaintiffs and reasonable consumers, Defendants knew or should have known that the Products had a serious defect, and were otherwise not able to safely or reliably function as intended and created a serious risk of infant injury or death, but Defendants omitted and concealed this material fact to consumers, including Plaintiff Gates and New York Subclass members, by continuing to place the Products into the stream of commerce without any notice or disclosure of the material defect.

194.  Defendants chose to market the Products in this way to impact consumer choices and gain market share. They are aware that all consumers who purchased the Products were exposed to and would be affected by their misrepresentations and omissions and would reasonably believe that the Products safely and reliably functioned and were safe for use by the user, and that Defendants' marketing materials, including representations and omissions, were otherwise accurate. However, Defendants' representations are false and misleading because the Products contain a material defect, are not safe for use by its user, and do not function safely or reliably.

195.  Defendant engaged in its unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

196.  Plaintiff Gates and other Class Members have been injured inasmuch as they, having viewed the misrepresentations and omissions regarding safety, and paid a

**CLASS ACTION COMPLAINT**

premium for the Products. Accordingly, Plaintiff Gates and other Class Members paid more than the Products they bargained for and received were worth.

197.    Defendants conduct as alleged herein constitutes a deceptive act and practice in business conduct violating New York General Business Law § 349(a), and Plaintiff and other Class Members have been damaged thereby.

198.    As a result of Defendant's deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, interest, and attorneys' fees and costs. This includes damages under GBL § 349 and statutory damages of $50 per unit purchased pursuant to GBL § 349.\

### COUNT III
### VIOLATION OF THE NEW YORK'S CONSUMER PROTECTION LAW ("NYGBL") §350, *ET SEQ.*
### (Plaintiff Gates Individually and on Behalf of the New York Subclass)

199.    Plaintiff Gates, individually and on behalf of the New York Subclass, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

200.    N.Y. General Bus. L. § 350, et seq. ("GBL § 350") makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York unlawful. GBL § 350 provides that "[i]n determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity … to which the advertising relates under the conditions prescription in said advertisement, but also any such conditions as are customary and usual."

201.    Throughout the Class Period, by advertising, marketing and/or selling the Products with claims that they are safe for infant sleep to Plaintiff and other Class and

**CLASS ACTION COMPLAINT**

Sub-Class Members, Defendants engaged in, and continues to engage in, false advertising concerning the safety of the Products.

202.    Plaintiffs and other Class and Subclass Members seek to enjoin such false advertising as described above. Each of the Class and Subclass Members will be irreparably harmed unless the unlawful actions of Defendants are enjoined in that Plaintiff and Class and Subclass Members will continue to be unable to rely on Defendants' representations regarding the safety of the Product.

203.    Defendants' marketing and advertising of the Product were likely to mislead reasonable consumers acting reasonably under the circumstances.

204.    Plaintiff would not have purchased the Product from Defendants and/or would not have paid as much for them had they known about the Defect and the inadequate remedy.

205.    Plaintiff was injured in fact and lost money as a result of Defendants' conduct. Plaintiff paid for a safe infant swing, but did not receive such products. The products Plaintiff received were worth less than the products for which they paid.

206.    Defendants engaged in unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

207.    Defendants' material misrepresentations and omissions were uniform.

208.    As a result of Defendants' acts and practices in violation of GBL § 350, Plaintiff and Class and Subclass members are entitled to monetary and compensatory damages, restitution, and disgorgement of all monies obtained using Defendants' unlawful conduct, interest, and attorneys' fees and costs, as well as statutory damages of $500 per Product purchased.

## COUNT IV
### Breach of Implied Warranties
### (Plaintiffs Individually and on Behalf of the Nationwide Class or, in the alternative, the Subclasses)

209.    Plaintiffs, individually and on behalf of the Nationwide Class, bring this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

210.    Defendants are and were at all relevant times a merchant involved in the manufacturing, distributing, warranting, and/or selling of the Products.

211.    The Products were and are, at all relevant times, "goods" within the relevant laws.

212.    Defendants knew or had reason to know of the specific use for which the Products, as goods, were purchased.

213.    Defendants entered into agreements with retailers, suppliers, and/or contractors to sell its Product to be used by Plaintiffs and Class Members.

214.    Defendants provided Plaintiffs and Class Members with implied warranties that the Products were merchantable and fit for the ordinary purposes for which the Products were used and sold and were not otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Defendants in it's the misrepresentations and omissions regarding safety. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendants and Plaintiffs and Class Members.

215.    Defendants breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose of providing a reasonably safe infant product that is suitable for infant sleep because, *inter alia*, the Products contains the Defect rendering the Products unsafe and unsuitable for infant sleep, and unreasonably dangerous. Therefore, the Product is not fit for its particular purpose.

### CLASS ACTION COMPLAINT

216.    Plaintiffs were forced to completely discontinue use of the Products shortly after their purchases when the Defect was discovered due to the ongoing safety risk of placing their infants in an unsafe sleeping environment.

217.    The aforementioned problems associated with Products constitute safety risks, such that the Product is not safe nor suitable for infant sleep, and therefore, there is a breach of the implied warranty of merchantability.

218.    Moreover, due to the inadequate and unfair nature of the Recall, it is not required and would be futile for Plaintiffs to provide Defendants further opportunity to cure their breach.

219.    Plaintiffs and Class Members have had sufficient direct dealings with either Defendants or one of their authorized retailers, representatives, and agents to establish privity of contract between Defendants, on the one hand, and Plaintiffs and each Class Member, on the other hand.

220.    Privity is not required because Plaintiffs and each of the Class Members are the intended beneficiaries of Defendants' warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranties provided by Defendants. Defendants' warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries of the Products. Thus, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiary of the Product and warranties.

221.    Defendants impliedly warranted that the Products are safe, suitable for infant sleep, of merchantable quality, and fit for their intended purpose. These implied warranties included, among other things: (i) a warranty that the Product manufactured, supplied, distributed, and/or sold by Defendants was safe and suitable for infant sleep; (ii) a warranty that the Product would be fit for its intended use while the Product is

being used; and (iii) a warranty that the Product would conform to all of the promises and affirmations of fact on the Product's label and online advertising.

222.   Instead, the Product contains a defective design and/or manufacture, as alleged herein. As a result of the Defect, the Product fails to conform with the promises or affirmations of fact on its label and online advertising.

223.   Defendants failed to adequately warn Plaintiffs and Class Members that the Products contained the Defect, were not safe or suitable for infant sleep, and could and have caused infants to be placed in dangerous sleep positions, suffocate, and die.

224.   Defendants breached the implied warranties because the Products were and are sold with the Defect, which prevents the Products from even the most basic degree of fitness for ordinary use as a reliable and safe sleeping product.

225.   Defendants' attempt to limit or disclaim any implied warranties is unconscionable and therefore unenforceable.

226.   Plaintiffs' complete inability to use the Products for their intended purpose, resulting from the fact that the Products did not meet the most basic degree of fitness for providing a safe sleep space for infants, renders any attempts to limit or disclaim damages substantively unconscionable.

227.   Plaintiffs and Class Members had no meaningful choice in determining the terms of which unreasonably favored Defendants, who had superior and exclusive knowledge of the Defect, which existed at the time of sale of the Product. A gross disparity in bargaining power existed between Defendants, and Plaintiffs and the Class Members, and Defendants knew or should have known that the Product was defective at the time of sale and would fail before its useful life.

228.   Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for its ordinary and intended purpose of providing a safe sleeping space for infants. Instead, the Products suffered, and continue to suffer, from the Defect as alleged herein.

**CLASS ACTION COMPLAINT**

229.   Defendants' failure to adequately repair or replace the dangerous Product caused the warranty to fail in its essential purpose.

230.   As a direct and proximate result of the foregoing, Plaintiffs and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT V
### Unjust Enrichment
### (Plaintiffs Individually and on Behalf of the Nationwide Class and, in the alternative the Subclasses)

231.   Plaintiffs, individually and on behalf of the Nationwide Class and/or the Illinois and New York Subclasses, bring this cause of action in the alternative and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

232.   Defendants' unfair and unlawful conduct includes, among other things, designing, manufacturing, and selling the Products with the dangerous Defect as well as making false and misleading representations about the Products through its misrepresentations and omissions regarding safety such as representing that is safe and suitable for infants sleeping on their backs. Defendants falsely represented the Product as being safe and suitable for infant sleep in its packaging, labeling, marketing, advertising, and promotions. Contrary to these representations, the Products pose an unreasonable risk of serious injury and death to infants.

233.   Defendants have continued to tout the safety of the Products even though the Products can and have caused numerous infants to roll from their backs to dangerous sleeping positions due to the Defect.

234.   While Plaintiffs and Class Members were harmed at the time of purchase, Defendants were unjustly enriched by their misrepresentations, false statements and/or material omissions.

**CLASS ACTION COMPLAINT**

235.   Plaintiffs and Members of the Class were harmed when they purchased Defendants' Product as a result of Defendants' misrepresentations, false statements and/or material omissions, as described in this Complaint. Plaintiffs and the Class Members purchased Defendants' Product. Plaintiffs and the Class Members have suffered injury in fact and lost money as a result of paying the price they paid for the Product due to Defendants' unlawful, unfair, and fraudulent business practices.

236.   Defendants' conduct allows them to knowingly realize substantial revenues from selling the Product at the expense of, and to the detriment of, Plaintiffs and Class Members, and to Defendants' benefit and enrichment. Defendants' retention of these benefits violates fundamental principles of justice, equity, and good conscience.

237.   Plaintiffs and Class Members conferred significant financial benefits and paid substantial compensation to Defendants for the Product, which was not as Defendants represented it to be.

238.   Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendants to retain the benefits conferred by Plaintiffs' and Class Members' overpayments.

239.   Plaintiffs and Members of the Classes seek disgorgement of all profits resulting from such overpayment.

**COUNT VI**
**Fraud**
**(Plaintiffs Individually and on Behalf of the Nationwide Class and, in the alternative the Subclasses)**

240.   Plaintiffs, individually and on behalf of Nationwide Class and, in the alternative, the Subclasses, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

**CLASS ACTION COMPLAINT**

241. Defendants knew or should have known that the Products contain the dangerous Defect rendering the Products unsafe and unsuitable for infant sleep.

242. Defendants provided Plaintiffs and Nationwide Class Members with false or misleading material information and failed to disclose material facts about the true nature of the Products, including but not limited to the fact they contain the dangerous Defect rendering the Products unsafe and unsuitable for infant sleep contrary to Defendants' misrepresentations.

243. Defendants promised consumers that the Products were fit for their intended purpose and that they were free of defects and safe and suitable for infant sleep through its misrepresentations and omissions regarding safety.

244. Defendants had exclusive knowledge of the Products' Defect at the time of sale and at all other relevant times. Neither Plaintiffs nor Class Members, in the exercise of reasonable diligence, could have independently discovered the true nature of the Products prior to purchase.

245. Defendants had the capacity to, and did, deceive Plaintiffs and Class Members into believing they were purchasing a product that was safe and suitable for infant sleep.

246. Defendants undertook active and ongoing steps to conceal the presence of the Defect in the Products. Plaintiffs are not aware of anything in Defendants' advertising, publicity, or marketing materials that disclosed the truth about the Products, despite Defendants' awareness of the problem.

247. The facts concealed and/or not disclosed by Defendants to Plaintiffs and Class Members are material facts in that a reasonable person would have considered them fundamental in deciding whether to purchase (or pay the same price for) the Product.

248. Defendants intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiffs and Class Members to act thereon.

**CLASS ACTION COMPLAINT**

249.    Defendants failed to adequately warn Plaintiffs and Class Members that the Products contained the Defect, were not safe or suitable for infant sleep, and could and have caused infants to be placed in dangerous sleep positions, suffocate, and die.

250.    Plaintiffs and Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the Products.

251.    The misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class Members reasonably and justifiability relied, were intended to induce and actually induced Plaintiffs and Class Members to purchase the Products.

252.    Plaintiffs and Class Members suffered a loss of money in an amount to be proven at trial as a result of Defendants' fraudulent concealment and nondisclosure because they would not have purchased the Products, or would not have purchased the Products for the price they did, if the true facts concerning the Products had been known.

253.    Plaintiffs and Class Members are entitled to all relief the Court proper as a result of Defendants' actions described herein.

## COUNT VII
### Negligent Misrepresentation
**(Plaintiffs Individually and on Behalf of the Nationwide Class and, in the alternative the Subclasses)**

254.    Plaintiffs, individually and on behalf of the Nationwide Class, or alternatively the Subclasses, bring this cause of action and hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

255.    As a seller of the Products, Defendants had a duty to give correct information to Plaintiffs and Class Members regarding the truth and accuracy regarding the material facts concerning the serious safety risks posed by the Products, including

**CLASS ACTION COMPLAINT**

knowledge of the Defect. Defendants had sole possession and control of this information and had a duty to disclose it accurately to Plaintiffs and Class Members.

256.   Defendants created a special relationship with Plaintiffs and Class Members through their misrepresentations and omissions regarding safety and through their designing, manufacturing, marketing, and selling the Product as a product specifically suitable for infant back sleep.

257.   Defendants intended the sale of the Products not only to affect Plaintiffs and Class Members, but Defendants actually considered the particular needs of caregiving consumers and designed, manufactured, and sold the Products for those consumers to meet their particular needs.

258.   Defendants held or appeared to hold unique or special expertise and knowledge of safe infant sleep and products for safe infant sleep. Defendants and Plaintiffs, as well as Class Members, had a special relationship of trust and confidence, and Defendants persuaded Plaintiffs and Class Members to purchase the Products based on their misrepresentations and reputation of having expertise and knowledge.

259.   Defendants made misrepresentations to Plaintiffs and Class Members through their misrepresentations and omissions regarding safety, *inter alia*, that the Products are safe and suitable for infant sleep. These misrepresentations were made with the direct purpose of inducing Plaintiffs and Class Members into purchasing the Product

260.   Because the Defect in the Products could not be detected until after it manifested, and because Defendants have denied and purposefully concealed the defective nature of the Products and the serious safety risks caused by the Defect, Plaintiffs and the Class Members were not reasonably able to discover the Defect, despite their exercise of due diligence.

261.   Defendants knew, or otherwise should have known, that the Products contained the Defect and posed serious safety risks to infants, based upon: (1)

**CLASS ACTION COMPLAINT**

Defendants' own internal testing, data, and surveys; (2) Defendants' Recall; and (3) the multiple reports of infant death in the Products.

262.    Despite Defendants' knowledge of material facts concerning the existence of the serious safety risks posed by the Products, Defendants actively concealed the serious safety risks from consumers by failing to disclose the serious safety risks to consumers.

263.    Defendants omitted, concealed, and failed to disclose to consumers that the Products pose serious safety risks to infants, including that the Products are inherently defective; unreasonably dangerous; not fit to be used for their intended purpose; and/or are capable of causing serious injury and death to infants. Rather than disclose this information, Defendants marketed the Products as safe and suitable for their intended purpose, infant sleep.

264.    The facts concealed and/or not disclosed by Defendants to consumers, including Plaintiffs and other Class Members, were material, in part, because they concerned an essential aspect of the Product, including the intended use and safety. Such facts affect the conduct of purchasers, and a reasonable person would have considered those facts to be important in deciding whether to purchase the Product. Rather than disclose this information, Defendants marketed and labeled the Product as a safe infant sleeper.

265.    Defendants intentionally concealed and/or failed to disclose such material facts for the purpose of inducing consumers, including Plaintiffs and other Class Members, to purchase the Products.

266.    Plaintiffs and other Class Members, without knowledge of the true nature of the Products, justifiably acted or relied upon the concealed and/or nondisclosed material facts to their detriment, as evidence by their purchase of the Products.

267.    As a direct and proximate result of Defendants' concealment and/or nondisclosure of material facts, consumers, including Plaintiffs and other Class

Members have been damaged as alleged herein, and are entitled to recover damages. Plaintiffs and other Class Members would not have purchased the Products on the same terms had they known that the Products posed serious safety risks to their infants.

268.    Plaintiffs and Class Members are entitled to all relief the Court finds proper as a result of Defendants' conduct described herein.

<u>**COUNT VIII**</u>
**Negligence – Failure to Warn**
**(Plaintiffs Individually and on Behalf of the Nationwide Class and, in the alternative, the Subclasses)**

269.    Plaintiffs, individually and on behalf of the Nationwide Class, or alternatively the Subclasses, bring this cause of action and hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

270.    Defendants directly or indirectly caused the Products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs and the other Class Members.

271.    At all times relevant, Defendants had a duty to exercise reasonable care in the design, testing, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of the Products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the Products.

272.    At all times relevant, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using the Products and appropriate, complete, and accurate warnings concerning the potential safety risks regarding the use of the Products, and, in particular, its uniform Defect.

**CLASS ACTION COMPLAINT**

273.   At all times relevant, Defendants knew or, in the exercise of reasonable care, should have known of the safety hazards and dangers the Products and, specifically, the uniform Defect.

274.   Defendants knew, or otherwise should have known, that the Products posed serious safety risks to infants, including Plaintiffs' and the other Class Members' infants, based upon: (1) their own internal testing, data, and surveys; (2) Defendants' Recall; and (3) the multiple reports of infant death in the Products.

275.   Accordingly, at all times relevant, Defendants knew or, in the exercise of reasonable care, should have known that use of the Products created a dangerous and unreasonable risk of injury and death to the infants using the Products, including Plaintiffs' and the other Class Members' infants.

276.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of the Products were unaware of the safety risks and the magnitude of the safety risks associated with use of the defective Products.

277.   Defendants omitted, concealed, and failed to disclose to consumers that the Products pose serious safety risks to infants, including that the Products were inherently defective; unreasonably dangerous; not fit to be used for their intended purpose; contained a Defect; and created an unsafe sleeping environment for infants.

278.   Defendants failed to adequately warn Plaintiffs and Class Members that the Products contained the Defect, were not safe or suitable for infant sleep, and could and have caused infants to be placed in dangerous sleep positions, suffocate, and die. Rather than disclose this information, Defendants, through its misrepresentations and omissions, *inter alia*, marketed the Products as safe and suitable for infant sleep.

279.   A reasonable manufacturer, distributor, or seller of the Products, under the same or similar circumstances, would have warned of the danger or instructed on safe use of Products.

**CLASS ACTION COMPLAINT**

280.    Defendants did not warn of the particular risks associated with the Products as detailed above, for reasons which fell below the acceptable standard of care, *i.e.*, about which a reasonably prudent manufacturer would have known and warned.

281.    As such, Defendants breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of the Products, in that Defendants manufactured, marketed, promoted, and sold the Products with the uniform Defect, knew or had reason to know of the Defect inherent in the Products, knew or had reason to know that an infant's use of the Products created a significant risk of serious injury and death and is unreasonably dangerous for infants, and failed to prevent or adequately warn of these risks and injuries.

282.    In breach of its duties, Defendants negligently:

a.    Failed to design, manufacture, formulate, and package the Products without the uniform Defect;

b.    Designed, manufactured, and formulated the Products such that they contained the uniform Defect;

c.    Failed to conduct adequate research and testing to determine the extent to which the Products were likely to cause infants to be placed in dangerous sleep positions; and

d.    Failed to warn that the Products could and have caused infants to be placed in dangerous sleep positions, suffocate, and die.

283.    Despite an ability and means to investigate, study, and test the Products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety of the Products.

**CLASS ACTION COMPLAINT**

284.    Defendants knew, or otherwise should have known, that it was foreseeable that consumers' infants, including Plaintiffs' and the other Class Members' infants, would be placed at risk of serious injury and death as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of the Products.

285.    Plaintiffs and the other Class Members did not know the nature and extent of the injuries that could result from the intended use of the Products.

286.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs and the other Class Members suffered, as described herein, including the injuries suffered by Plaintiffs' and the other Class Members' infants.

287.    Defendants' failure to warn or instruct was a substantial factor in causing Plaintiffs' and other Class Members' harm.

288.    Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of the Products, including Plaintiffs and the other Class Members and their infants, with full knowledge of the dangers of the Products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs and the other Class Members. Defendants' reckless conduct therefore warrants an award of aggravated or punitive damages.

289.    As a direct and proximate result of Defendants' wrongful acts and omissions in placing the defective Products into the stream of commerce without adequate warnings of the risks of serious injury and death to infants, Plaintiffs and the other Class Members have been damaged and their infants have been placed at risk of serious injury and death.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly

**CLASS ACTION COMPLAINT**

situated, respectfully requests that this Court:

    a.    Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class Counsel;

    b.    Ordering payment of actual and punitive damages, restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class Members as a result of Defendants' unlawful, unfair and fraudulent business practices;

    c.    Ordering injunctive relief as permitted by law or equity, further permanently enjoining Defendants from continuing the unlawful practices as set forth herein, issuing a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products and the implementation of a corrective advertising campaign to alert caregivers to the dangers of inclined swings marketed for infant sleep, including the Product, and educating them about the standards for safe infant sleep by Defendants, and an offer to replace the Product with a reasonable and safe infant product;

    d.    Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Classes;

    e.    Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

    f.    Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

DATED:  November 18, 2024

*/s/ Kyle McLean*
Kyle McLean (SBN 330580)

**CLASS ACTION COMPLAINT**

1

2     Lisa R. Considine (*pro hac vice forthcoming*)
      Leslie L. Pescia (*pro hac vice forthcoming*)
3     **SIRI & GLIMSTAD**
      700 S. Flower Street, Suite 1000
4     Los Angeles, CA 90017
      Telephone: 212-532-1091
5     Facsimile: 646-417-5967
      kmclean@sirillp.com
6     lconsidine@sirillp.com
      lpescia@sirillp.com
7

8     *Attorneys for Plaintiffs and the Proposed Class*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28